## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KEEGAN ALLANACH

       Plaintiff,

v.                             **CASE NO.: 8:21-cv-41-VMC-AEP**

THE GLENRIDGE ON PALMER
RANCH, INC., a Florida corporation,

       Defendant.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW

    Defendant, The Glenridge on Palmer Ranch, Inc. ("the Company" or "Defendant"), under Fed. R. Civ. P. 56, moves for summary judgment on all claims by Plaintiff, Keegan Allanach ("Ms. Allanach" or "Plaintiff"), and states as follows:

## I.   INTRODUCTION

    The Company is a healthcare facility operating a senior-living community. April 15, 2020 was a scary time. The COVID-19 pandemic was rampant, and the risk to seniors such as those under the Company's care was especially acute. Tension was particularly high at the Company. A day earlier, news broke that an employee had for the first time tested positive for the virus. The facility's Administrator and highest official, Julie Irvin, held a meeting to reassure staff and to reinforce precautionary protocols. Among other precautions, the need for universal mask wearing, which was also required by regulatory mandate from the State of Florida,

was stressed. She opened the floor for questions and directed staff to speak loudly or move closer so as to be heard with masks still in place. Various employees asked questions, and all complied with Dr. Irvin's express instructions.

All but one that is. Plaintiff, a new employee still in her probationary period, defied Dr. Irvin and removed her mask to speak. After a visibly upset Dr. Irvin demanded that Plaintiff put her mask back in place, Plaintiff waved her hand at Dr. Irvin, complained that the mask made it hard to breathe, withdrew her question, and told Dr. Irvin with an attitude to just "forget" about it. Right after the meeting, Dr. Irvin—who perceived Plaintiff's conduct as reckless, disrespectful, and insubordinate—received feedback that such conduct was consistent with other difficulty dealing with Plaintiff. After conferring with some colleagues who agreed with the decision, Dr. Irvin terminated Plaintiff's probationary employment that day.

Plaintiff sued alleging transgender discrimination. But she does not and cannot attribute discriminatory intent to Dr. Irvin or the decision to terminate her. For the myriad reasons that follow, her claims fail as a matter of law.

## II.   STATEMENT OF MATERIAL FACTS ("SOMF")[1]

### A.   Background

1.     Ms. Allanach was born a male. *See* Deposition of Keegan Allanach, Ex. A hereto ("Pl. Tr."), at 65:18-19. She transitioned from male to female in 2017, and she presents as female. *Id.* at 65:20-23, 66:8-18.

---

[1] For purposes of this Motion, the Company assumes as true Plaintiff's testimony.

2.     The Company is a senior-living community and healthcare facility; its services include skilled nursing, independent senior living, assisted living, and memory care. *Id.* at 59:4-23, 51:11-16.

3.     It hired Plaintiff as a Certified Nursing Assistant ("CNA"), which is a healthcare position, on March 25, 2020. *Id.* at 47:16-18, 54:14-16, 59:24-60:4.

4.     Ms. Allanach reported to the charge nurses, the director of nursing, and/or the assistant director of nursing. *Id.* at 55:22-56:18.

5.     They all ultimately reported to the Administrator, Julie Irvin, who was responsible for and oversaw the entire facility and all of its healthcare staff. *Id.* at 57:9-58:3.

6.     All new hires were required to complete an initial probationary period of at least 90 days before being brought on as a full-time employee. *Id.* at 55:1-4.

7.     Plaintiff's employment was terminated on April 15, 2020, less than a month after she began and well before completion of her probationary period. *Id.* at 28:24-29:7, 54:14-16, 55:9-12.

8.     At the time, she had only just completed her initial training and had never worked by herself. *Id.* at 51:17-25.

**B.     Plaintiff's Conduct Preceding Her Termination**

9.     Both Plaintiff and the Company were at all times regulated by the Florida Agency for Health Care Administration ("AHCA"). *Id.* at 60:2-12.

10.     Plaintiff's brief employment period coincided with one of the initial waves of the COVID-19 pandemic. *Id.* at 61:4-17.

11.     COVID-19 vaccination was not yet available during the period of Plaintiff's employment, and the risks throughout that time to the senior population under the Company's care was particularly acute. *Id.* at 61:18-22.

12.     Throughout Plaintiff's employment period AHCA regulatory guidance required facilities like Company to "**implement universal use of facial masks while in the facility**" such that "[a]ll staff, essential healthcare visitors and anyone entering the facility" were required to "don a mask upon the start of their shift or visit and only change it once it becomes moist." *Id.* at 62:1-11 & Ex. 2. Per AHCA, "**ALL STAFF AND ANYONE ENTERING THE FACILITY MUST WEAR A FACIAL MASK AT ALL TIMES**[.]" *Id.*; *see also* Declaration of Julie Irvin, Ex. B hereto ("Irvin Dec."), at ¶ 4 & Ex. 1.

13.     Plaintiff knew and understood that AHCA expected universal mask wearing by employees like her. Pl. Tr. at 101:12-15, 101:24-102:1.

14.     But wearing a mask made Plaintiff uncomfortable and she says it made it difficult for her to breathe and to work. *Id.* at 78:14-25, 90:23-91:4, 92:3-7.

15.     She expressed her frustration with wearing a mask. *Id.*

16.     On April 14, 2020, news broke that a Company employee had for the first time tested positive for COVID-19. *Id.* at 80:14-81:10; *see also* Irvin Dec. at ¶ 5-6.

17.     This was very concerning.  Pl. Tr. at 82:3-10; Irvin Dec. at ¶ 5.

18.     That next day, April 15, 2020, Dr. Irvin led an all-staff meeting to discuss the positive test result and the Company's response and commitment to COVID-19 precautionary protocols. Pl. Tr. at 80:14-24; Irvin Dec. at ¶ 5-6.

19.     Janet Underwood, Infection Prevention and Control Officer, also spoke to and emphasized the need to follow all protocols; among other protocols, the need to strictly adhere to wearing masks was stressed. Irvin Dec. at ¶ 6; *see also* Declaration of Janet Underwood, Ex. C hereto ("Underwood Dec."), at ¶ 2-3 & Ex. 1; Declaration of Dawn Grathoff, Ex. D hereto ("Grathoff Dec."), at ¶ 3 & Ex. 1.

20.     Dr. Irvin also opened the floor for questions from staff. Pl. Tr. at 85:9-10. To enable questions to be heard through masks, she instructed anyone with a question to speak loudly or move closer. *Id.* at 85:20-23.

21.     Various employees asked questions, and all but Plaintiff complied with Dr. Irvin's express instructions: Plaintiff alone disobeyed Dr. Irvin and moved her mask so as to speak without it on her face. *Id.* at 85:9-86:4, 86:20-87:9, 88:4-11, 88:17-21, 91:5-8, 106:12-107:2, 108:17-20; *see also* Irvin Dec. at 7 & Ex. 2.

22.     Plaintiff admits her conduct (while at the all-staff meeting to emphasize COVID-19 protocols) was contrary to both Dr. Irvin's express instructions and AHCA requirements. Pl. Tr. at 86:20-87:9, 91:5-8, 106:12-107:2, 108:17-20.

23.     And no other employees similarly disobeyed any instructions from Dr. Irvin or moved their masks from their faces at the staff meeting. *Id.* at 80:14-24, 88:4-11, 88:17-21; *see also* Irvin Dec. at 7 & Ex. 2.

24.     Dr. Irvin was visibly upset by Plaintiff's actions, and she immediately demanded Plaintiff properly put her mask back in place. Pl. Tr. at 87:4-9.

25.     Plaintiff replaced her mask but scoffed, waved her hand at Dr. Irvin, sat down, complained that the mask made it hard to breathe, and withdrew her question with an attitude, telling Dr. Irvin to just "forget" about it.[2] *Id.* at 85:23-86:13, 87:10-20; *see also* Irvin Dec. at ¶ 7 & Ex. 2.

26.     Dr. Irvin perceived Plaintiff's actions as reckless, disrespectful, and insubordinate.  Irvin Dec. at ¶ 8; Pl. Tr. at 87:7-9, 87:18-20.

27.     Following the meeting, Polly Giuliani, a nurse who worked with Ms. Allanach, approached Dr. Irvin and indicated that Ms. Allanach's insolence at the meeting was consistent with her pattern of difficult behavior, stating, "Now you see what I have to deal with, with her."  Irvin Dec. at ¶ 9 & Ex. 2.

28.     Ms. Giuliani (now deceased) was kind to Plaintiff, was very sweet, and would never have lied about her to get her in trouble. Pl. Tr. at 71:10-72:2.

29.     Other employees also expressed concern and frustration with Ms. Allanach's conduct at the meeting. Irvin Dec. at ¶ 9 & Ex. 2; Underwood Dec. at ¶ 3 & Ex. 1; Grathoff Dec. at ¶ 3 & Ex. 1.

---

[2] Company witnesses testified that Plaintiff removed her mask and had to be asked to replace it multiple times before doing so while rudely giving Dr. Irvin attitude.  *See* Irvin Dec. at ¶ 7 & Ex. 2; Underwood Dec. at ¶ 3 & Ex. 1; Grathoff Dec. at ¶ 3 & Ex. 1.  For this Motion, Company has presented Plaintiff's version of events.

C.   **Plaintiff's Termination**

30.     Dr. Irvin, Ms. Underwood, and Dawn Grathoff (another nursing manager), conferred. Irvin Dec. at ¶ 10.  Dr. Irvin expressed serious concern with Plaintiff's behavior at the meeting and the other feedback she had received. *Id.* at ¶ 10 & Ex. 2. She also considered that Ms. Allanach was a very new employee, still in her 90-day probationary period. *Id.* at ¶ 10 & Exs. 2, 4. All three agreed with the decision to terminate Ms. Allanach's employment, with Dr. Irvin the ultimate decisionmaker. Irvin Dec. at ¶ 11; *see also* Underwood Dec. at ¶ 4; Grathoff Dec. at ¶ 4.

31.     Ms. Allanach agrees Dr. Irvin was the decisionmaker as to her termination. Pl. Tr. at 79:20-24.

32.     Dr. Irvin informed Ms. Allanach of her termination and showed her paperwork reflecting that she was being terminated for "[j]ob [p]erformance" and "[m]isconduct[,]" including "[u]nsatisfactory work performance and poor attitude[,]" "[i]nsubordination" and "failure to follow requirements[,]" and "not wearing required mask during COVID." Pl. Tr. at 77:1-78:12 & Ex. 9.

33.     Plaintiff read this and responded in writing. *Id.* at 78:14-79:17.

34.     Plaintiff did not dispute any of the underlying conduct; nor did she allege any discriminatory animus. *Id.* at 89:12-90:10 & Ex. 9, 109:13-20. Rather, she expressed her view that she should have been excused from the mask mandate with which she admittedly failed to comply because wearing a mask made it hard for her to breathe. *Id.* She made no attempt to justify her attitude or insubordination. *Id.*

### D. <u>Plaintiff's Post-Termination Conduct</u>

35.    That night, Ms. Allanach crafted a full-page email to a Company Human Resources official, Sunya Wilson. *Id.* at 107:9-15 & Ex. 11.

36.    Titled "Wrongful dismissal," her email explained why she believed her termination was unfair. *Id.* at 107:16-23. She tried to be complete and accurate. *Id.* She again made no mention of any alleged discrimination *Id.* at 109:13-20. Nor did she attempt to justify her poor attitude or insubordination. *Id.* at Ex. 11. Instead, she again emphasized that "it was difficult for me to do my job" and to breathe while wearing a mask. *Id.* This time she mentioned an "asthma condition" as well. *Id.*[3]

37.    The day after her termination, Plaintiff continued to try to justify her earlier failure to wear a mask; she alleges that on April 16, 2020, she procured a doctor's note asking (without elaboration) that she be allowed "back to work without restrictions" and with a surgical rather than a cloth mask. *Id.* at 104:16-105:17, 136:14-17 & Ex. 14.

---

[3] Ms. Allanach was asked for but failed to produce (and gave false testimony to try to hide) this email in discovery. *Id.* at 136:22-138:20, 203:16-205:13 & Exs. 12, No. 18; 15, No. 13.  In addition, her post-employment plea to excuse her prior mask failure due to asthma was irreconcilable with a pre-employment questionnaire in which she had represented that she had never experienced any "asthma or any other breathing disorders." *Id.* at 115:3-116:13, 118:4-15 & Ex. 4.  No matter—Ms. Allanach did not cite asthma as an excuse for her insubordination, did not cite asthma as an excuse for *anything* until after termination, and alleges only transgender (not disability) discrimination. *Id.* at 65:14-17 & Exs. 6, 9, 11; *see also* SOMF, ¶ 34-36.

E.     **Plaintiff's Claims**

38.     Plaintiff alleges transgender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and under the Florida Civil Rights Act of 1992 ("FCRA"). *Id.* 65:14-17, 73:18-74:4 & Ex. 6.

39.     Her sole contention is that she was terminated on the basis of her transgender status. *Id.*

40.     Plaintiff presents as a female and denies that it is possible to know she is transgender by her appearance. *Id.* at 66:16-18, 124:3-6.

41.     She attributes knowledge of her transgender status to only a handful of Company employees. *Id.* at 67:23-69-24.

42.     These employees were generally *nice* to her. *Id.* at 71:10-72:24.

43.     She does not believe any employee to whom she attributes knowledge of her transgender status would have lied about her to get her in trouble. *Id.*

44.     Dr. Irvin, the decisionmaker as to Plaintiff's termination, is not on the list of persons to whom Plaintiff attributes knowledge of her transgender status. *Id.* at 67:23-68:20, 69:22-24; *see also* SOMF, ¶ 30-31.

45.     Nor are the other two individuals (Ms. Grathoff and Ms. Underwood) who conferred with Dr. Irvin and agreed with the decision. Pl. Tr. at 67:23-68:20, 69:22-24; *see also* SOMF, ¶ 30.

46.     Ms. Allanach had no personal interactions with Dr. Irvin until the day of her termination, does not recall having any interactions with Ms. Underwood, and very rarely interacted with Ms. Grathoff. Pl. Tr. at 58:4-24.

47.     Throughout Plaintiff's employment she had no problems with—and attributes no misconduct whatsoever to—Dr. Irvin, Ms. Grathoff, and/or Ms. Underwood. *Id.* at 58:25-59:3.

48.     The only allegations she makes throughout her employment are that a few employees and patients not involved in her termination were discussing her transgender status amongst themselves or asking her uncomfortable questions during her first week of training. *Id.* at 123:2-134:1. Specially, she alleges (1) an unidentified patient once reported that two unidentified coworkers were discussing that she was transgender, and the patient accused Plaintiff of lying about being a married woman with children;[4] (2) a CNA named Jordan once commented that other unidentified coworkers and/or patients had said that Plaintiff was tall, had big hands for a woman, or looked like a man; (3) a CNA named Scott once said he didn't want to work with Plaintiff; and (4) her direct supervisor (Kathleen O'Reilly) once commented on a changed hairstyle being a "transgender thing." *Id.* These interactions with Ms. O'Reilly, Scott, Jordan, and unidentified patients are the only

---

[4] Plaintiff admits that she was not married and did not have children, but she claimed she had not lied because she has a puppy she treats like a son. *Id.* at 12:15-13:7, 128:17-129:12.

-10-

ones Plaintiff alleges were in any way negative during her employment. *Id.* at 128:11-16.

### F.   Plaintiff's Alleged Prior Permission to Remove Her Mask

49.    Plaintiff alleges that when she had breathing difficulties, one nurse (Polly) and one coworker CNA (Scott) gave her permission to briefly remove her mask and go outside. *Id.* at 92:23-93:15, 94:17-96:1, 96:22-25.

50.    Dr. Irvin, Ms. Underwood, and Ms. Grathoff did not know of Plaintiff ever being given permission to remove her mask. Irvin Dec. at ¶ 14; Underwood Dec. at ¶ 5; Grathoff Dec. at ¶ 5; Pl. Tr. at 95:15-96:18, 97:1-3.

51.    Nor does Plaintiff contend she had permission to remove her mask at the April 15, 2020 staff meeting that preceded her termination; she instead admits she disobeyed Dr. Irvin's instructions at the meeting. Pl. Tr. at 86:20-87:9, 91:5-8.

### G.   Plaintiff's Alleged Comparators

52.    Plaintiff argues she was similar to six alleged comparators: Scott last name unknown (CNA); Polly G. (nurse/supervisor); Carmen last name unknown (CNA); Maggie last name unknown (CNA); Jordan Reed (CNA); and Roxanne last name unknown (nurse) ("the Alleged Comparators"). *Id.* at 97:4-98:7.

53.    Based on Plaintiff's description, the actual names of the Alleged Comparators are Scott Lightner, Polly Giuliana, Carmen Velazquez, Maggie McKinnen, Jordan Reed, and Roxana Rodriguez. Irvin Dec. at ¶15-16.

54.    Plaintiff argues that each of the Alleged Comparators removed his or her mask at one time or another. Pl. Tr. at 97:4-98:7.

55.    Plaintiff alleges that all the mask violations she attributes to the Alleged Comparators occurred during the first week or few days of her employment, before any Company employee tested positive for COVID-19 and before the all-staff meeting to discuss COVID-19 protocols on April 15, 2020. *Id.* at 98:22-99:18.

56.    Plaintiff cannot identify anyone, other than herself, who removed a mask: (a) at the staff meeting to discuss COVID-19 protocols that preceded her termination; (b) at any time after the Company had learned that an employee had tested positive for COVID-19; and/or (c) in the presence of Dr. Irvin at any time. *Id.* at 57:12-20, 80:14-24, 88:4-11, 88:17-21, 98:22-99:6-18, 100:3-6.

57.    All of the Alleged Comparators had respectively completed their probationary periods; none was a probationary employee like Plaintiff. *Id.* at 98:13-21; Irvin Dec. at ¶ 17.

58.    Plaintiff did not report any of the Alleged Comparators for allegedly not wearing a mask, is not aware of any witnesses to the alleged conduct, and is not aware of anyone else making a report or allegation. Pl. Tr. at 99:19-100:6.

59.    Dr. Irvin, Ms. Underwood, and Ms. Grathoff were not aware of any allegation that any of the Alleged Comparators had ever not properly worn a mask. Irvin Dec. at ¶ 16; Underwood Dec. at ¶ 6; Grathoff Dec. at ¶ 6; Pl. Tr. at 100:3-6.

60.    None of the Alleged Comparators, like Plaintiff, is alleged to have had difficulty wearing a mask. Pl. Tr. 100:18-22.

61.    None of the Alleged Comparators, like Plaintiff, is alleged to have been insubordinate to Dr. Irvin. *Id.* at 100:23-101:4.

62.    Plaintiff is not aware of any employee, other than herself, who was insubordinate or accused of being insubordinate to Dr. Irvin. *Id.*. No such employee exists. Irvin Dec. at ¶ 18.

## III.    STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To proceed, Plaintiff "must produce substantial evidence" supporting her claims; neither a "metaphysical doubt as to the material facts" nor a "mere scintilla" of evidence is enough. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (quotations omitted). A genuine and material factual dispute exists only if "the evidence is such that a reasonable jury could return a verdict for" Plaintiff. *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011) (quotation omitted). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1170 (11th Cir. 2018) (quotation omitted); *see also Myers v. Bowman*, 713 F.3d 1319, 1327, 1332 (11th Cir. 2013) (noting that speculation does not create a genuine issue of material fact).

## IV.    DISCUSSION

### A.    Analytical Framework

 Ms. Allanach alleges transgender discrimination under Title VII and the FCRA. These claims are subject to the same substantive standards and may be

analyzed in tandem. *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998). Because there is no direct evidence,[5] the *McDonnell Douglas*[6] framework generally applies. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002). Ms. Allanach must first establish a *prima facie* case. *See id.* This requires her to show: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that [the Company] treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218, 1220-21, 1224 (11th Cir. 2019) (en banc).

If (but only if) Ms. Allanach shows a *prima facie* case, the burden of production shifts to the Company to articulate one or more legitimate reason(s) for its actions. *Rojas*, 285 F.3d at 1342. This burden is merely one of production, not proof or persuasion, and is "exceedingly light." *See Flournoy v. CML-GA WB, LLC*, 851 F.3d 1335, 1339 (11th Cir. 2017); *see also Duckworth v. Pilgrim's Pride Corp.*, 764 F. App'x 850, 853 (11th Cir. 2019).

Ms. Allanach must then show all stated reasons are mere pretext for unlawful discrimination. *See Rojas*, 285 F.3d at 1342. To do so, she cannot recast or quarrel "with the wisdom" of the Company's business judgment but must instead meet *each*

---

[5] "[D]irect evidence must conclusively show that the employee was discriminated against without any inference or presumption." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 n.4 (11th Cir. 2013); *see also Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002).

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

proffered reason "head on and rebut" it. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030, 1037 (11th Cir. 2000) (en banc); *see also Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007); *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006). And she must show *both* that each "reason was false, *and* that discrimination was the real reason." *Brooks*, 446 F.3d at 1163 (emphasis in original); *see also Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018).

Throughout this process, the burden of persuasion remains on Plaintiff. *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013). Her claims fail at each step. Accordingly—and because there is *no* evidence of unlawful conduct, let alone a "convincing mosaic" of proof, *see id.*—Defendant is entitled to summary judgment.

**B.   All Claims Fail for Lack of Proof of the Decisionmaker's Actual Knowledge of Plaintiff's Transgender Status**

All claims fail at the outset because there is no record evidence of the decisionmaker's actual knowledge that Ms. Allanach was transgender. To the contrary, Ms. Allanach testified that (a) she presented as a female; (b) her transgender status is not facially apparent; and (c) she attributes knowledge of her transgender status to only a handful of Company employees, none of whom was the decisionmaker as to her termination. *See* SOMF, ¶ 40-41, 44-45.

Thus end Plaintiff's claims. "Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Payne v. Goodyear Tire & Rubber Co.*, 760 F. App'x 803, 809 (11th Cir. 2019) (quoting *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001)). An "employee cannot be fired 'because

of' a" protected trait "unless the decisionmaker has *actual* knowledge of" it. *Id.* (quoting *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005)). Where, as here, a plaintiff fails to marshal evidence that the decisionmaker had such knowledge, summary judgment is required. *Id.* at 809-10; *see also Perry v. Pediatrix Med. Grp. of Ga.*, 841 F. App'x 174, 177-78 (11th Cir. 2021) ("Critically, [the plaintiff] also had to show that the decisionmaker knew he was a member of a protected class."); *Cordoba*, 419 F.3d at 1185 ("[S]ummary judgment was appropriate because there was no evidence that the decision-maker was aware of the plaintiff's disability when he made the decision to fire him."); *Soliman v. Hillsborough Sch. Dist.*, No. 8:06-CV-1811-T-30-MSS, 2008 WL 1995001, at *4 (M.D. Fla. May 8, 2008) (awarding summary judgment because plaintiff had "not provided any evidence demonstrating that the decision not to hire him was made by someone who was aware of his religion").

## C.   <u>All Claims Fail Because Plaintiff Cannot Prove a *Prima Facie* Case</u>

Plaintiff's claims independently fail for the additional reason that she cannot prove a *prima facie* case. To do so, she must identify an appropriate non-transgender comparator who was not terminated. *See Lewis*, 918 F.3d at 1220-21, 1224. She must show that she and her proffered comparator "were 'similarly situated in all material respects[,]'" *i.e.*, that they were "sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Id.* at 1218, 1224, 1228 (quotation omitted). But distinguishments abound.

*First*, all the Alleged Comparators had successfully completed their

-16-

probationary periods, whereas Plaintiff was a very new employee still in her probationary period. *See* SOMF, ¶ 6-7, 57. An employer is entitled to cut more slack to proven employees than to new hires who act out before even completing their probationary period. *See Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1292 (11th Cir. 2018) (noting at "first blush" that plaintiff and proffered comparator who had engaged in same misconduct appeared "to be similarly situated" but holding comparator was *not* valid and citing the "important difference[]" that the plaintiff "was a new employee who was still well within her six month probationary period" whereas the comparator was not); *see also Payne*, 760 F. App'x at 808 (holding no valid comparator where plaintiff "could not point to a non-African-American probationary employee who" was similar); *White v. Hall*, 389 F. App'x 956, 960 (11th Cir. 2010) (holding no valid comparator because plaintiff "could not identify any other probationary deputy, of any race, who had been insubordinate and had not been fired"); *Marshall v. Mayor & Alderman of City of Savannah, Ga.*, 366 F. App'x 91, 99-100 (11th Cir. 2010) (holding no valid comparator because record contained no evidence of a similar male still in probationary period); *Catanzaro v. Lyons*, 232 F. App'x 878, 879 (11th Cir. 2007) (affirming summary judgment where probationary employees were terminated and permanent employees were suspended or demoted for same infraction); *Sugg v. City of Sunrise*, No. 19-CV-62866-UU, 2020 WL 6193514, at *6 (S.D. Fla. Oct. 6, 2020) ("Plaintiff was a probationary employee, and none of Plaintiff's putative comparators were probationary employees. Plaintiff thus fails to identify a similarly situated comparator . . . ."); *Walters v. McDonald*, No. 2:14-

CV-602-FTM-29MRM, 2016 WL 4079982, at *6-7 (M.D. Fla. Aug. 1, 2016) (holding plaintiff in probationary period was not similarly situated to permanent employees); *Bicknell v. City of St. Petersburg*, No. 8:03-CV-1045-T-27, 2006 WL 560167, at *10 (M.D. Fla. Mar. 7, 2006) (same).

*Second*, Plaintiff alone was disrespectful and insubordinate to Dr. Irvin. She does not even *try* to allege that the Alleged Comparators (or anyone else) engaged in such misconduct. *See* SOMF, ¶ 24-26, 32, 61-62. An employer is entitled to differentiate and dispense harsher discipline for different (or cumulative) offenses. *See Lewis*, 918 F.3d at 1218, 1224, 1228; *see also Frazier v. Safelite Grp., Inc.*, No. 3:17-CV-1366-J-32MCR, 2019 WL 2372257, at *4 (M.D. Fla. June 5, 2019) ("[W]here a comparator's conduct or violation is 'less serious,' he is not similarly situated."); *Evans v. Fla. Transp. Servs., Inc.*, No. 6:08-CV-120-ORL-31KRS, 2009 WL 635765, at *5 (M.D. Fla. Mar. 11, 2009) (holding comparators who all used cell phones at work were not similarly situated where none was *also* alleged to have disrespected supervisor like the plaintiff).

*Third*, only Plaintiff had the audacity to remove her mask in defiance of the Administrator's instructions *while at the meeting to discuss the importance of COVID-19 protocols* and *after* the first positive staff member. *See* SOMF, ¶ 21-23, 55-56. Plaintiff admits that the pandemic posed a serious threat to the Company's senior population and that tensions were high. *Id.*, ¶ 10-11, 16-17. An employer is entitled to evaluate the circumstances of an infraction and to structure punishment accordingly. *See*

*Lewis*, 918 F.3d at 1218, 1224, 1227-28; *see also Bennett v. Chatham Cty. Sheriff Dep't*, 315 F. App'x 152, 159 (11th Cir. 2008).

*Finally*, even if the circumstances were otherwise similar in all material respects—and they aren't even close—all of the Alleged Comparators would *still* be invalid comparators as a matter of law. There is no evidence that Dr. Irvin (the decisionmaker) or even Ms. Underwood or Ms. Grathoff (with whom she consulted before termination), *knew* of the conduct Plaintiff now attributes to the Alleged Comparators. *See* SOMF, ¶ 58-59. As a matter of law (and common sense), decisionmakers cannot be guilty of disparate discipline based on other misconduct not actually known by them. Thus, "proffered comparators' actions are only relevant if it is shown that the decision maker knew of the prior similar acts and did not discipline the rule violators." *Summers v. City of Dothan, Ala.*, 444 F. App'x 346, 348 (11th Cir. 2011); *see also Shockley v. HealthSouth Cent. Ga. Rehab. Hosp.*, 293 F. App'x 742, 745 (11th Cir. 2008) ("Evidence that other employees were guilty of similar misconduct but were not disciplined does not establish that an individual is similarly situated when the party taking the adverse action was unaware of the employees' misconduct."); *Jones v. Gerwens*, 874 F.2d 1534, 1541-42 (11th Cir. 1989). And the requisite "[k]nowledge of a prior act cannot be imputed on a decision maker" because discrimination requires "actual knowledge, and real intent, not constructive knowledge and assumed intent." *Summers*, 444 F. App'x at 348 (quotation omitted); *see also Frazier*, 2019 WL 2372257, at *4.

**D.**    **All Claims Fail Because Plaintiff Cannot Prove Pretext**

Even if otherwise viable, Plaintiff's claims also fail because she cannot show pretext. The reasons for her termination included "[u]nsatisfactory work performance and poor attitude[,]" "[i]nsubordination" and "failure to follow requirements[,]" and "not wearing required mask during COVID." *See* SOMF, ¶ 32. These are legitimate reasons. *E.g., Lee v. Safe-Dry Carpet & Upholstery*, No. 20-14275, 2021 WL 3829028, at *3 (11th Cir. Aug. 27, 2021) (holding plaintiff legitimately fired for "good-faith belief that [he] showed poor performance, work ethic, and attitude"); *Langston v. Lookout Mountain Cmty. Servs.*, 775 F. App'x 991, 1001 (11th Cir. 2019) (holding plaintiff legitimately "fired for insubordination" where decisionmaker believed she had disregarded order); *Jest v. Archbold Med. Ctr., Inc.*, 561 F. App'x 887, 890 (11th Cir. 2014) (holding summary judgment appropriate despite evidence arguably showing plaintiff "was terminated because of her disability" because she "failed to adequately rebut" all legitimate reasons for termination, including "patient safety concerns"); *Dent v. Ga. Power Co.*, 522 F. App'x 560, 563-64 (11th Cir. 2013) (holding plaintiff's termination for "insubordinate behavior in a meeting with his superiors" was legitimate). Thus, Plaintiff's claims fail unless she can show these reasons are mere pretext. *Rojas*, 285 F.3d at 1342. She cannot recast or quarrel "with the wisdom" of the Company's business judgment but must instead meet *each* proffered reason "head on and rebut" it. *Chapman*, 229 F.3d at 1030, 1037; *see also Crawford*, 482 F.3d at 1308-09; *Brooks*, 446 F.3d at 1163. But she comes

nowhere close to showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the Company's reasons "that a reasonable factfinder could find them unworthy of credence." *See McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (quotation omitted); *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005).

*First*, as to her failure to properly wear a mask, Plaintiff admits that she (and *only* she) moved her mask from her face at the staff meeting to discuss COVID-19 protocols and that doing so was contrary to the expectations of Dr. Irvin and the requirements of AHCA. *See* SOMF, ¶ 21-23. Admitted misconduct is not pretext. *E.g.*, *Gibson v. Valley Ave. Drive-In Restaurants, LLC*, 597 F. App'x 568, 570 (11th Cir. 2014).

*Second*, even if Plaintiff could undermine the legitimacy of the Company's explanation that she failed to properly wear a mask (she cannot), to survive summary judgment she must show pretext as to *each* explanation for her termination. *See Crawford*, 482 F.3d at 1308; *Chapman*, 229 F.3d at 1037. But Plaintiff doesn't even try to dispute that she (and *only* she) defied an instruction from Dr. Irvin and was insubordinate and disrespectful toward Dr. Irvin in front of the other staff. *See* SOMF, ¶ 21-26. And *even if* Plaintiff could somehow show *she* believed her conduct was acceptable, that is irrelevant. *Dr. Irvin* understandably believed the conduct was unacceptable, and Plaintiff concedes that Dr. Irvin perceived disrespect. *Id.*, ¶ 26. Dr. Irvin's belief is all that matters. *See Langston*, 775 F. App'x at 1001 ("[A]ll that

matters is [the decisionmaker's] understanding" of whether the plaintiff was insubordinate and defied an order); *Tebo v. City of DeBary, Fla.*, 784 F. App'x 727, 730 (11th Cir. 2019) ("Whether [the decisionmaker] was mistaken in [his] beliefs is not relevant to our inquiry, and it is not our role to determine whether [the plaintiff] was, for example, actually insubordinate."); *Dent*, 522 F. App'x at 564 ("[T]he fact that someone other than [the plaintiff's] employer might not have viewed his conduct as insubordinate does not prove pretext or establish a jury question as to pretext.").

*Third*, though the insubordination directly to Dr. Irvin and her independent assessment of it was enough, Plaintiff cannot dispute that Dr. Irvin *also* received (and believed) feedback that Plaintiff's conduct at the meeting was consistent with other insolence and difficulty dealing with her during her probationary period. *See* SOMF, ¶ 27-30; *see also Lee*, 2021 WL 3829028, at *3 ("An employer's honest, good-faith belief that an employee violated its policies is a legitimate reason for termination even if the employer's belief may have been mistaken or wrong. . . . The same logic applies to poor performance."). Plaintiff disavows any notion that Ms. Giuliani—a kind and sweet woman—would have lied about her to get her in trouble. *See* SOMF, ¶ 28; *see also id.* at ¶ 41-43. And absent evidence not only that Ms. Giuliani was lying about the difficulty with Plaintiff but also that Dr. Irvin believed she was lying— impossible given that Plaintiff herself perceived Ms. Giuliani as honest and also that the report was consistent with what Dr. Irvin had just witnessed—there can be no pretext. *See Lee*, 2021 WL 3829028, at *3 (holding no pretext given decisionmaker's

good-faith belief in report of plaintiff's poor work ethic and bad attitude, even absent evidence that the report was accurate).

*Finally*, even if Plaintiff could rebut each reason for her termination—and she cannot rebut any—her claims would *still* fail. She must show *both* that each "reason was false, *and* that discrimination was the real reason." *Brooks*, 446 F.3d at 1163 (emphasis in original); *see also Hornsby-Culpepper*, 906 F.3d at 1312. But she has no evidence of discriminatory animus at all. To the contrary, she admits that no one in the decisional process ever said or did anything offensive. *See* SOMF, ¶ 47-48.

*Smelter* shows how far short Plaintiff's claims fall. There, an employee, the only black woman in her office, had experienced severe and pervasive harassment, including enduring "racist remarks by her co-workers nearly every day" culminating in being called a "dumb black n[*]gger" (and then complaining of the racism) on *the day* she was fired. *Smelter*, 904 F.3d at 1279-80, 1282-83. Despite abhorrent evidence of racism (which supported a hostile work environment), and the facts that her employer refused to explain to her why she was being fired when her coworker was the one using racist slurs (instead providing only a form indicating she was in her probationary period and "not a good fit for the organization"), the employer was entitled to summary judgment on the retaliation and discrimination claims as there was insufficient evidence of pretext as to one of its three proffered reasons for discharge (poor performance in probationary period). *Id.* at 1279-80, 1283, 1290-91.

### E.   No Other Evidence of Discrimination

Finally, Plaintiff has not presented a "convincing mosaic of circumstantial evidence" of unlawful conduct. *See Sims*, 704 F.3d at 1333. She admits she has no evidence of discriminatory animus by the decisionmaker or in the decisional process, SOMF, ¶ 47, which is dispositive*, see Sims*, 704 F.3d at 1332-33*; see also Mitchell v. Pilgrim's Pride Corp.*, 817 F. App'x 701, 710 (11th Cir. 2020). Her case instead rests on a few comments by other employees or reports from unidentified patients. SOMF, ¶ 48. But some of these allegations (*e.g.*, report from an unidentified patient about a staff discussion) are hearsay. And hearsay—particularly imprecise hearsay—is no bar to summary judgment. *E.g., Rojas*, 285 F.3d at 1342 n.3. More importantly, *none* of the alleged comments was by a decisionmaker or in connection with the termination decision or process. Comments (especially ambiguous ones) "by non-decisionmakers do not raise an inference of discrimination," let alone create a convincing mosaic of proof.[7] *See Mitchell v. USBI Co.*, 186 F.3d 1352, 1355 (11th Cir. 1999); *see also Jones v. RS&H, Inc.*, 775 F. App'x 978, 991 (11th Cir. 2019).

Plaintiff has not even convinced herself discrimination was afoot. At her termination meeting she (1) made no mention of alleged discriminatory animus; and (2) did not dispute her underlying conduct (instead merely arguing that one of the violations, her failure to properly wear a mask, should have been excused). SOMF, ¶ 32-34. Then, the night of her termination, she wrote an email as to why she disagreed

---

[7] Such statements are not even admissible. *See Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003).

with her termination, once again making no mention of any alleged discrimination, not disputing the underlying conduct, and attempting merely to bolster her excuse for not properly wearing a mask by citing to an asthma condition that she had expressly omitted from her pre-employment health questionnaire. *Id.*, ¶ 35-36 & n.3. The next day, she says she procured a post-termination doctor's note seeking to again justify her failure to wear a mask (but none of the other misconduct). *Id.*, ¶ 37. Plaintiff obviously recognized that the concern with her failure to properly wear a mask was not a ruse but rather at least one of multiple legitimate, non-discriminatory bases for her termination.

## V.    **CONCLUSION**

The Company respectfully requests that the Court award summary judgment in its favor on all claims.

Respectfully submitted this 13th day of October, 2021.

**ROGERS TOWERS, P.A.**

By: */s/ Samuel J. Horovitz*
    Lori S. Patterson
    Florida Bar No. 0111023
    Samuel J. Horovitz
    Florida Bar No. 0059015
    1301 Riverplace Blvd., Ste 1500
    Jacksonville, Florida 32207
    (904) 398-3911 (telephone)
    lspatterson@rtlaw.com
    shorovitz@rtlaw.com

**ATTORNEYS FOR DEFENDANT**