# Exhibit B

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KEEGAN ALLANACH

    Plaintiff,

v.                                          CASE NO.: 8:21-cv-41-VMC-AEP

THE GLENRIDGE ON PALMER
RANCH, INC., a Florida corporation,

    Defendant.
_____/

## DECLARATION OF JULIE IRVIN

I, Julie Irvin, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am over the age of 21 and have personal knowledge of the matters set forth below.

2. I am the Administrator and Director of Health Services for The Glenridge on Palmer Ranch, Inc. ("Company"). All Company healthcare staff are under my ultimate authority and supervision. I also worked in this capacity in 2020.

3. I am familiar with the allegations in this lawsuit by Keegan Allanach that her employment with the Company was terminated for her being transgender. It was not.

4. Ms. Allanach's former employment coincided with an initial wave of the COVID-19 pandemic. Throughout her employment, both she and the Company

were required to comply with the guidance from the Florida Agency for Health Care Administration that is attached hereto as Exhibit "1."

5. On April 14, 2020, the Company learned that a different employee had tested positive for COVID-19. This was the first known positive case among Company staff. It was very concerning.

6. The Company promptly issued a press release. The Company also called for an all-staff meeting on April 15, 2020, to discuss the positive case, address concerns, and emphasize the need to follow precautionary protocols. I led the meeting, along with Janet Underwood (Infection Prevention and Control Officer). Among other protocols, the need to adhere to properly wearing masks was stressed.

7. At the meeting, Ms. Allanach engaged in misconduct that I found very troubling, particularly given the circumstances. I had opened the floor for questions, and all staff except for Ms. Allanach continued to wear their required masks. She alone, however, removed her mask. When I insisted that she put it back, she was further rude and disrespectful. Attached as Exhibit "2" hereto is a copy of a more detailed written statement that I prepared the day after the meeting. Everything I wrote therein was true and accurate, and I incorporate it herein.

8. I believed Ms. Allanach's conduct was reckless, disrespectful, and insubordinate.

9. As referenced in the statement attached as Exhibit "2," a nurse who worked with Ms. Allanach approached me after the meeting to report that Ms. Allanach's behavior was consistent with her pattern of being difficult, stating in

reference to Ms. Allanach, "Now you see what I have to deal with, with her." That nurse was Polly Giuliani. Other staff also expressed concern with Ms. Allanach's behavior at the meeting. I believed the report from Ms. Giuliani and the concerns from other staff, which were consistent with my personal observations.

10. After the meeting, I conferred with Ms. Underwood and with Dawn Grathoff (Director of Nursing). I was very concerned by Ms. Allanach's actions, particularly under the circumstances and with her being a new hire still in her 90-day probationary period. They had similar concerns.

11. All three of us agreed with the decision to terminate Ms. Allanach, with me being the ultimate decisionmaker.

12. Attached hereto as Exhibits "3" and "4" respectively are true and correct copies of Ms. Allanach's termination form and of an email I sent to process the termination.

13. The reasons for Ms. Allanach's termination are accurately reflected in the top part of the attached termination form (portions above the employee statement), in the attached email, and in the attached statement I prepared. The reasons did not include any discrimination whatsoever.

14. I am not aware of Ms. Allanach ever having permission to remove her mask at work. She certainly never had my permission to do so.

15. During the time Ms. Allanach was employed, the only Scott, Carmen, and Maggie who were Certified Nursing Assistants were Scott Lightner, Carmen Velazquez, and Maggie McKinnen. The only Polly was a nurse named Polly

Giuliani. We did not have anyone named Roxanne, but there was a nurse named Roxana Rodriguez.

16. I am not aware of Scott Lightner, Roxana Rodriguez, Polly Giuliani, Carmen Velazquez, Maggie McKinnen, or Jordan Reed ever not properly wearing a mask while working. The first time I ever heard any of them accused of such misconduct was by Ms. Allanach in the course of this lawsuit.

17. During the time Ms. Allanach was employed by the Company, Scott Lightner, Roxana Rodriguez, Polly Giuliani, Carmen Velazquez, Maggie McKinnen, and Jordan Reed had all already successfully completed their respective probationary periods.

18. No other Company employee has ever been insubordinate or disrespectful to me in a manner similar to Ms. Allanach.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of October, 2021.

Julie Irvin

# EXHIBIT "1"

**Sunya Wilson**

| | |
|---|---|
| **From:** | Julie Irvin |
| **Sent:** | Wednesday, April 15, 2020 3:48 PM |
| **To:** | Sunya Wilson |
| **Subject:** | Residential and Long Term Care Facilities to Implement Universal Use of Facial Masks |
| **Importance:** | High |

Received 03/18/2020



AGENCY FOR
HEALTH CARE
ADMINISTRATION

RON DESANTIS
GOVERNOR

MARY C. MAYHEW
SECRETARY

Home | About Us | Medicaid | Licensure & Regulation | Report Fraud

## Residential and Long Term Care Facilities to Implement Universal Use of Facial Masks

### EFFECTIVE IMMEDIATELY IN ALL RESIDENTIAL / LONG TERM CARE FACILITIES:

- **ALL STAFF AND ANYONE ENTERING THE FACILITY MUST WEAR A FACIAL MASK AT ALL TIMES**
- **GLOVES WHEN PROVIDING DIRECT CARE TO A PATIENT OR RESIDENT**

**Effective immediately staff of residential and long term care facilities are to implement universal use of facial masks while in the facility.** All staff, essential healthcare visitors and anyone entering the facility are to don a mask upon the start of their shift or visit and only change it once it becomes moist. It is important to keep hands away from the mask and only touch the straps of the mask. **Gloves are to be worn when providing care to the resident.** Continue to perform hand hygiene prior to donning gloves, after removing gloves, and anytime there is contact with the resident environment.

**Staff in a room with a patient with respiratory symptoms of unknown cause or a patient with known or suspected COVID-19 should adhere**

**to Standard, Contact, and Droplet Precautions with eye protection. This includes wearing gown, gloves, N95 mask (as fitted and available – if not available, at least a facial mask), and eye protection such as face shields or goggles.**

In addition to securing more gowns, gloves, and masks, facilities will need to immediately order the appropriate eye protection (I.e. face shields) since many do not have this on hand. In the event you are unable to acquire the necessary PPE, please notify your local emergency management agency.

## GUIDANCE ON USE AND CONSERVATION OF Personal Protective Equipment (PPE)

Facilities will need to educate their staff on the proper donning (putting on), doffing (taking off), and disposal of any PPE.

Information about the recommended duration of Transmission-Based Precautions is available in the Interim Guidance for Discontinuation of Transmission-Based Precautions and Disposition of Hospitalized Patients with COVID-19

### Gloves – Frequently Asked Questions

- **What type of glove is recommended to care for suspected or confirmed COVID-19 patients in healthcare settings?**
    - Nonsterile disposable patient examination gloves, which are used for routine patient care in healthcare settings, are appropriate for the care of patients with suspected or confirmed COVID-19.

- **Is double gloving necessary when caring for suspected or confirmed CoVID-19 patients in healthcare settings?**
    - CDC Guidance does not recommend double gloves when providing care to suspected or confirmed 2019-COVID patients.

- **Are extended length gloves necessary when caring for suspected or confirmed COVID-19 patients in healthcare settings?**
    - According to CDC Guidance, extended length gloves are not necessary when providing care to suspected or confirmed COVID-19 patients. Extended length gloves can be used, but CDC is not specifically recommending them at this time.

- **How do I put on (don) and take off (doff) my mask and gloves?**
    - Check to see if your facility has guidance on how to don and doff PPE. The procedure to don and doff should be tailored to

2

- the specific type of PPE that you have available at your facility.
  - If your facility does not have specific guidance, the CDC has recommended sequences for donning and doffing PPE.
  - It is important for HCP to perform hand hygiene after removing PPE. Hand hygiene should be performed by using an alcohol-based hand sanitizer that contains 60-95% alcohol or washing hands with soap and water for at least 20 seconds. If hands are visibly soiled, soap and water should be used before returning to alcohol-based hand sanitizer.

**Additional Resource**
Guideline for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings.

# Effective Immediately
## In All Residential / Long Term Care Facilities

### ALL STAFF AND ANYONE ENTERING THE FACILITY MUST WEAR A FACIAL MASK AT ALL TIMES



**AND**

### GLOVES WHEN PROVIDING DIRECT CARE TO A PATIENT OR RESIDENT

**HOWEVER**

Staff in a room with a patient with respiratory symptoms of unknown cause or a patient with known or suspected COVID-19 **should adhere to Standard, Contact, and Droplet Precautions with eye protection.**
This includes wearing gown, gloves, N95 mask (as fitted and available – if not available, at least a facial mask), and eye protection such as face shields or goggles.

 

Florida HEALTH

*The Agency for Health Care Administration is committed to better health care for all Floridians. The Agency administers Florida's Medicaid program, licenses and regulates more than 44,000 health care facilities and 53 health plans, and publishes health care data and statistics at www.FloridaHealthFinder.gov. Additional information about Agency initiatives is available via Facebook (AHCAFlorida), Twitter (@AHCA_FL) and YouTube (/AHCAFlorida).*

Agency for Health Care Administration | 2727 Mahan Drive, Tallahassee, FL 32308 | http://ahca.myflorida.com

4

This message was sent to jprins@theglenridge.com from:

State of Florida Agency for Health Care Administration | AHCANotice@ahca.myflorida.com | HQA Provider Notice | 2727 Mahan Drive, Ft. Knox Bldg. #1, Room 136 | Tallahassee, FL 32308

**Manage Your Subscription**

AGENCY FOR HEALTH CARE ADMINISTRATION

# EXHIBIT "2"

April 16, 2020

On Wednesday, April 15th, Janet Underwood, Infection Prevention and Control Officer, and I held a staff meeting with everyone working in the Carroll Center to address the rumors and concern and explain to them the voluntary Press Release and the current situation related to the employee who tested positive. (See Attached Press Release).

Explained to them that the employee has not been here for 11 days, we just found out the day before that the employee had tested positive. Further explained that if they happen to receive a call from the media, they should direct them to the CEO or myself, to ensure we continue to give accurate information and remain transparent.

I reminded all staff that non-direct-care staff are to wear the reusable, cloth masks and the surgical, disposable masks are to be used by clinical staff (Nurses and CNAs only). I reiterated this point and asked if any of the non-direct-care staff needed the cloth masks, a couple of housekeepers raised their hands and I let them know we would have more tomorrow and I would get them to their supervisor but in the meantime to continue to wear the disposable ones. Janet addressed the Carroll Center Nursing and CNA staff about the need for them to be at work, unless they are ill, and addressed their concerns about safety related to an employee having tested positive. Janet reminded everyone that the employee was last in the building 11 days ago and no members or staff are showing any symptoms of illness.

Staff were asked if they had any questions or concerns. Several staff asked questions and questions were answered. All staff were wearing their masks, as required, during the entire time of the meeting and always while in the facility.

Keegan raised her hand, pulled her own personal cloth mask down, and stated she had a question. I responded and said "Please put your mask back on", to which she said, "I can't talk with it on", to which I responded "Put your mask back on", she did not, and said she can't breathe with it on. I again said, very sternly, but calmly, "Put. Your. Mask. Back. On. It. Is. Required.". At that time, she pulled her mask back on and, with an attitude, said she wasn't going to ask her question anymore.

After this occurred, I asked if anyone else had questions, one or two staff members had comments, but not questions, we finished by thanking everyone for the hard work they are doing and told them to keep up the great work and we will have a big celebration when we get on the other side of this pandemic.

After the meeting, the nurse who works with Keegan, said "Now you see what I have to deal with, with her.", referencing Keegan being difficult. Additionally, several staff made comments that they could not

believe that she removed her mask and refused to put it back on. Furthermore, I received feedback that the employee has been less than cooperative, has been working on her own less than 2 weeks, is in her 90-days and is just not performing to the Glenridge standard. I talked to Janet Underwood and expressed my concern that if Keegan is openly defying the requirement to wear a mask while sitting in the middle of a member area, in a meeting with all staff and supervisors present, I was very concerned about whether she was following the requirement in patient rooms when no one is around. Janet reminded me that she has addressed this specific issue with Keegan previously. Due to the extreme risk to our members and the critical importance of all staff following the requirement to wear a mask at all times while within the facility, as well as the expressed performance issues – it was decided that Keegan was not up to the Glenridge standard. Keegan demonstrated an open unwillingness to follow a very critical requirement and therefore presented a risk to the health of our members; therefore we agreed it would be best for the facility and for the safety of our members to terminate her employment with us. She was called into my office, with the Infection Prevention Officer and the Director of Nursing present. I let her know that what occurred in the meeting regarding the mask was another example of a performance issue that had been brought to the attention of Nurse management and a blatant disregard for the safety of our members and it was thus determined that she was not a good fit for the Glenridge and that her employment was being terminated effective immediately.

Respectfully submitted,

Julie Irvin, Ph.D., LNHA
Director of Health Services



**Contact:**
Julie Irvin, Ph.D., LNHA
JIrvin@theglenridge.com
(941) 552-3591
April 14, 2020

## Skilled Nursing Employee at The Glenridge Tests Positive for COVID-19

**SARASOTA, Fla.** – A PRN (as needed) nurse – who worked in The Carroll Center Skilled Nursing neighborhood within The Glenridge on Palmer Ranch – has tested positive for COVID-19, the community learned today. The nurse, who was asymptomatic and last worked at The Glenridge on April 4, was tested as a precautionary measure through the Sarasota County Health Department, due to residing in the same household as an individual who had tested positive on April 6. Once The Glenridge became aware of the April 6 test results, the nurse was not permitted to return to the facility. The nurse is currently quarantining at home, per CDC guidance.

The Glenridge has reported this information to all appropriate regulatory authorities, as well as to staff, members, and to the families of those residing in the healthcare areas of the campus.

Earlier today, representatives from the Agency for Health Care Administration (AHCA) and epidemiologists from the Florida Department of Health visited The Carroll Center to tour the facility and review protocol and procedures.

"They were impressed with what we have in place," said Julie Irvin, Ph.D., LNHA, Director of Health Services at The Glenridge. "I asked them if we could do anything better or different, but they said we are doing everything we can do – and then some – to mitigate the risk. They told us to keep up the good work."

"Since the beginning of the COVID-19 outbreak in the U.S., The Glenridge has been vigilant in protecting the health and safety of our members and staff," added Dr. Irvin. "As part of that process, we have rigorously screened, temperature-checked, and interviewed all those entering our community. Anyone exhibiting symptoms or not meeting the screening criteria has been denied access. In this case, the individual had no symptoms."

According to Dr. Irvin, the entire Glenridge healthcare staff began wearing masks while in the facility, prior to AHCA's requirement to do so – and they are now receiving an additional temperature screening during their work shift. In addition, all Glenridge members residing in The Carroll Center are having temperature checks three times daily and are being monitored closely for respiratory symptoms and signs of illness.

"At this time, no one in our healthcare areas has shown or is showing any signs of illness – and we are thankful for that," said Dr. Irvin. "But we are committed to full transparency throughout this crisis and will provide updates if things change or if additional information becomes available."

---

*The Glenridge on Palmer Ranch, a Life Fulfilling Community®, is located on a 90-acre campus situated within the master-planned Palmer Ranch community. The Glenridge features individual club homes and low-rise private residences, a 60,000-sq.-ft. Village Commons area with multiple dining venues, a 260-seat Performing Arts Center, a Fitness Center, a 75-foot heated pool and two HAR-TRU® tennis courts. The Glenridge also offers a Health Assurance Guarantee program, which provides members with access to private care residences in assisted living and skilled nursing at a significant discount to the market rate.*

# # #

# EXHIBIT "3"

# THE GLENRIDGE ON PALMER RANCH

| Employee Name: Keegan Allanach | Today's Date: 04/15/2020 |
|---|---|
| Job Title: CNA | Supervisor: DGrathoff, RN |

## EMPLOYEE VIOLATION

| ☐ Attendance | ☐ Tardiness | X Job Performance | ☐X Misconduct |
|---|---|---|---|
| ☐ Insubordination | ☐ Safety Violation | ☐ Other: | |

**SUPERVISOR STATEMENT:** Describe Incident/Performance Issue. Please be specific.

- GPR Member handbook pg 42 #1. Unsatisfactory work performance and poor attitude
- GPR Member handbook pg 43 #22. Insubordination- failure to follow requirements regarding wearing the isolation mask as directed

**CORRECTIVE ACTION:** Describe problem resolution/expected behavior changes/performance.

Terminated, effectively immediately, due to placing members at risk by not wearing required mask during COVID19.

## ACTION TAKEN

Warning: ☐ Verbal   ☐ Written   ☐X Final   ☐ Suspension   Dates:

(Employee Termination)

## EMPLOYEE STATEMENT

☐ I *AGREE* with Supervisor's Statement    ☒ I *DO NOT AGREE* with Supervisor's Statement

I Have Hard time Brething and as report this to My supervisor serveal times, Today I was told My emloyment was no longer Needed.

**NOTICE TO EMPLOYEE: IMMEDIATE AND SATISFACTORY IMPROVEMENT MUST BE SHOWN OR FURTHER DISCIPLINARY ACTION MAY BE TAKEN, INCLUDING DISCHARGE.**

| Employee Signature: Keegan Allanach | Date: 04/15/2020 |
|---|---|
| Supervisor Signature: | Date: 4/15/2020 |
| Witness Signature: | Date: 4/15/2020 |

# EXHIBIT "4"

# Sunya Wilson

| | |
|---|---|
| **From:** | Julie Irvin |
| **Sent:** | Wednesday, April 15, 2020 3:19 PM |
| **To:** | Deniese Williams; Montana Irizarry |
| **Cc:** | Sunya Wilson; Dawn Grathoff; Janet Underwood |
| **Subject:** | Keegan Allanach |
| **Importance:** | High |

We are terminating this employee today – she picked up three shifts for Mr. Loranger that you all will need to get covered.
She is being terminated for failure to follow requirements regarding wearing the mask as well as performance and attitude issues.
She is very new and has proven that she is not Glenridge material.


Julie Irvin, Ph.D., LNHA
Director of Health Services
The Glenridge on Palmer Ranch
Office: (941) 552-3591



1